UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


BRIAN KINGHORN,                        )
                                       )
              Plaintiff,               )
                                       )
                                       )    CIVIL ACTION NO.
                                       )    11-12078-DPW
          v.                           )
                                       )
THE GENERAL HOSPITAL                   )
CORPORATION a/k/a                      )
MASSACHUSETTS GENERAL                  )
HOSPITAL,                              )
                                       )
              Defendant.               )


MEMORANDUM AND ORDER
July 1, 2014

     Plaintiff Brian Kinghorn, who has Asperger's Syndrome,

brought this action against his former employer, Massachusetts

General Hospital ("MGH"), under the Americans With Disabilities

Act (ADA), 42 U.S.C. § 121101 *et seq.*, alleging that MGH

discriminated against him by failing to provide him with a

reasonable accommodation and terminating his employment.  MGH now

moves for summary judgment.

## I.  BACKGROUND

     The following facts are undisputed, except where noted.

     In the Spring of 2010, Plaintiff, then a recent graduate of

a Master's program in statistics at Columbia University, applied

for a position as a full-time Bioinformatics Specialist in MGH's
Biostatistics Center.  The Biostatistics Center provides
statistical support to various research groups within MGH, and a
Bioinformatics Specialist performs statistical analysis of
research data using a statistics program called SAS.  An
advertisement for the position emailed to Plaintiff boasted that
the Biostatistics Center "provide[s] an excellent environment for
professional growth and training" and that the Center was "glad
to hire good students who want to spend two years getting
practical experience before going into a Ph.D. program."

MGH requested Plaintiff's references, and, after receiving
positive recommendations from them, arranged an in-person
interview at the Center.  In an internal email regarding the
interview process, the Center's Director, Dr. Dianne Finkelstein,
expressed her view that in-person interviews are essential to
screen for "weirdness."

On May 27, 2010, Plaintiff met individually with Elizabeth
Smoot, Dr. Eric Macklin, Dr. Doug Hayden, Dr. Hang Lee, Dr.
Finkelstein, and his would-be supervisor, Dr. David Schoenfeld.
Each interview was scheduled for between twenty and forty
minutes.  Plaintiff met with Finkelstein for less than five
minutes.  In internal discussions among Plaintiff's interviewers,
Plaintiff was described as "personable, soft-spoken, and clear in

his communication." He was said to be candid and forthright about his abilities, and admitted that he lacked experience with two types of software codes used regularly by the Center. Everyone who interviewed Plaintiff, with the exception of Dr. Finkelstein, was impressed with him. Dr. Finkelstein thought Plaintiff was "somewhat green" and wanted to "use [the Center] to work for 2 years and then go for a PhD." She expressed doubt that Plaintiff was "PhD material" and stated: "I wonder if we can get a better candidate. I no longer have a high respect for Columbia's MA program. I think it is just their cash cow." Dr. Schoenfeld disagreed, stating that he was "somewhat impressed by [Plaintiff] and [hadn't] seen anyone better."

Despite Dr. Finkelstein's reservations, MGH offered Plaintiff the job sometime in early July. Plaintiff was hired to replace Ms. Smoot, who had been working on the Acute Respiratory Distress Syndrome ("ARDS") Project. Because Smoot was leaving in early August, Dr. Schoenfeld encouraged Plaintiff to start as soon as possible in order that Smoot would have more time to train him.

Plaintiff began work at MGH on July 26, 2010. At the time, Dr. Schoenfeld was on vacation. Plaintiff spent his first day attending MGH's new employee orientation, where he received information about many MGH policies and procedures, including the

MGH Standards of Behavior, which he read and signed.  After
attending the orientation, Plaintiff then went to MGH's Employee
Assistance Program, where he met with a counselor to seek
assistance in finding a psychotherapist in the Boston area.

Plaintiff first went to the Biostatistics Center on the
afternoon of July 27, after a day and a half of employee
orientation.  On July 28, Plaintiff met with Ms. Smoot to begin
his training.  Although the plan was for Smoot to train Plaintiff
prior to leaving her position a few weeks later, Plaintiff and
Smoot did not get along.  According to MGH, Plaintiff was very
resistant to her training and suggestions, and when he was unable
to successfully run the programs he was instructed to learn, he
began trying to "fix" and "re-write" them.  From Plaintiff's
perspective, Smoot was too busy to train him properly, quickly
grew impatient, and became increasingly hostile in her
interactions with him.

The next day, July 29, Plaintiff and Ms. Smoot got into a
heated argument.  Plaintiff yelled at Smoot and lost his temper.
A staff member notified Nancy Ringwood, the ARDS Project Manager.
Ms. Ringwood intervened and separated the two.  She then met with
Plaintiff, who continued to be angry and hostile.  He said to
Ringwood: "I don't even know who you are; you just walked in
here."  Ringwood reminded him that they had met at a staff

meeting the previous day.  Plaintiff described Smoot's training
as "terrible" and complained that he was not receiving an
adequate orientation.  Ringwood also met with Ms. Smoot, who was
visibly upset.  Smoot reported that Plaintiff was refusing to do
anything she had requested and was being openly hostile.

Ringwood telephoned Dr. Schoenfeld, who was on vacation, to
advise him of the situation.  Dr. Schoenfeld suggested that
another employee, Dr. Eric Macklin, assist in Plaintiff's
training.  Ringwood also spoke with Human Resources and Carolyn
Hintlian, Senior Administrative Manager of the Biostatics Center,
to discuss the situation.  On July 30, Hintlian and Human
Resources Manager Patricia Sheehan discussed the situation and
decided that they and Dr. Macklin would meet with Plaintiff to
address his behavior.

Hintlian and Macklin met with Plaintiff on the morning of
July 30 for approximately two hours.  During this meeting,
Plaintiff voiced his frustration with the training he was
receiving.  At the conclusion of the meeting, Plaintiff handed
Hintlian and Macklin a letter disclosing that he had Asperger's
Syndrome, which is an Autism Spectrum Disorder.  The purpose of
the letter was to "explain the differences and challenges [faced
by Plaintiff] along with the accommodations that may be necessary
due to [his] condition."  The letter explained that Plaintiff had

difficulty reading nonverbal signs and "conceptualizing, understanding, or predicting emotional states in other people," and that he had "a need for rigid structure and routine and can be upset by change." In the letter, Plaintiff offered several "suggestions to promote a more positive work environment." Plaintiff implored his colleagues to: "[u]nderstand that I am listening even though I might not be looking at you"; "provide specific, detailed instructions of my work assignments"; and "[p]lease be patient with me when assigning a task as I may need to ask many questions before it is clear to me and I can fully understand." The letter also explained that Plaintiff "may respond to stress by sitting alone for a while." Plaintiff testified at his deposition that the letter was a form letter he found on the internet and copied verbatim, but nothing on the face of the letter indicates it was anything other than a communication of his own.

Prior to July 30, Plaintiff had not disclosed his Asperger's Syndrome, except to the Employee Assistance Program, which is "walled off" within MGH and cannot reveal employee disclosures without permission. Under the "Special Accommodations" section of a pre-placement screening form that Plaintiff submitted to Occupational Health prior to beginning his employment, Plaintiff answered "No" to the question: "Do you have any health

condition(s) that may interfere with your ability to perform your basic job duties in a healthy and safe manner?"  Plaintiff also left blank a space for "additional comments."

Ms. Sheehan of Human Resources met with Plaintiff on the afternoon of July 30.  At the time of their meeting, she had not spoken with Hintlian or Macklin, and was thus unaware of Plaintiff's Asperger's Syndrome.  During the meeting, Plaintiff was hostile, argumentative and angry.  He characterized his co-workers as "dumb asses,"[1] and was extremely upset that his supervisor, Dr. Schoenfeld, was not present for the start of his employment.  Plaintiff told Sheehan that he "hated it here." Sheehan advised Plaintiff that MGH had wanted to terminate him due to his behavior over the previous few days and that if he wished to continue his employment, he would need to start behaving appropriately.  Plaintiff responded by saying he hated Sheehan and hated his job.  Plaintiff then handed Sheehan a copy of the letter detailing his diagnosis of Asperger's Syndrome. Sheehan asked Plaintiff why he had not disclosed his diagnosis earlier, and he responded that his psychiatrist had advised him not to.  Sheehan then referred Plaintiff to the Employee

---

[1] In his affidavit, Plaintiff disputes that he characterized his co-workers as "dumbasses," insisting instead that he was only repeating what his brother had said of his MGH colleagues during an earlier conversation.

Assistance Program — unaware that he had already sought their assistance in finding a new therapist — and set up a follow-up meeting for Monday, August 2.

On August 2, Sheehan received a call from an EAP counselor informing her that Plaintiff did not feel it was necessary to meet with Sheehan again. At Sheehan's insistence, Plaintiff came to her office, where he informed her that he wished to continue his employment at MGH. Sheehan then instructed Plaintiff to go to Occupational Health. She explained that it was MGH's policy that an employee meet with Occupational Health after disclosing a potential disability, to determine what, if any, accommodations were necessary. Plaintiff then met with Tara Kileen from Occupational Health and gave her permission to contact his psychiatrist in New York. After meeting with Plaintiff, Kileen sent him home for the day.

Following Plaintiff's meeting with Occupational Health, Director of Occupational Health Andrew Gottlieb advised Sheehan that Plaintiff would need structure to his work day and detailed instructions in order to succeed in his position. The Biostatistics Center had already begun to create daily training plans for Plaintiff and, acting on Gottlieb's advice, reduced the plans to writing and provided them to Plaintiff. The plans set forth a precise schedule of tasks to be performed over the course

of the day.  A considerable amount of time and effort was put
into formulating the plans.

Despite the structured program that was devised for
Plaintiff, he continued to have difficulty following directions.
For example, on August 3, despite being tasked to work on a
particular project, Plaintiff instead requested to shadow Ms.
Smoot to learn more about the project she was working on.  Ms.
Ringwood instructed Plaintiff to follow his training program and
focus on his assigned task.  Later that day, because of Ms.
Smoot's discomfort with Plaintiff, Dr. Finkelstein moved Smoot
into an office with a locking door that would create some
distance between Smoot and Plaintiff and provide Smoot with a
sense of comfort.  On August 4, Dr. Finkelstein directed
Plaintiff to have no further contact with Smoot.  Despite this
instruction, Plaintiff again went to Smoot's office and requested
to work on her project.

Sometime after August 4, the decision was made to terminate
Plaintiff.  His termination was finalized on August 12, 2010.
MGH takes the position that Plaintiff was terminated because of
his inappropriate and disruptive behavior, his displays of anger
and aggression, his inability to work collaboratively or
independently, and his resulting inability to perform the
essential functions of his job.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation."  *Farmers Ins. Exch.* v. *RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I view the facts in the light most favorable to the party opposing summary judgment.  *Rivera-Colón* v. *Mills*, 635 F.3d 9, 10 (1st Cir. 2011).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

## III.  DISCUSSION

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). In order for Plaintiff to make out a prima facie discrimination claim, he must prove "that (1)[ ]he suffers from a disability or

-10-

handicap, as defined by the ADA; (2)[ ]he was nevertheless able
to perform the essential functions of [his] job, either with or
without reasonable accommodation; and (3) the defendant took an
adverse employment action against [him] because of, in whole or
in part, [his] protected disability." *Freadman* v. *Metro. Prop. &*
*Cas. Ins. Co.*, 484 F.3d 91, 99 n.7 (1st Cir. 2007).
Discrimination is defined to include "not making reasonable
accommodations to the known physical or mental limitations of an
otherwise qualified individual with a disability . . ., unless
[the] covered entity can demonstrate that the accommodation would
impose an undue hardship on the operation of the business of such
covered entity."  42 U.S.C. § 12112(b)(5)(A).

     Claims of disability discrimination under the ADA are
evaluated according to the familiar burden-shifting framework
outlined by the Supreme Court in *McDonnell-Douglas Corp.* v.
*Green*, 411 U.S. 792 (1973).  *See Tobin* v. *Liberty Mut. Ins. Co.*,
433 F.3d 100, 104 (1st Cir. 2005).  Under this approach, the
plaintiff must first establish a prima facie case.
*McDonnell-Douglas*, 411 U.S. at 802.  Assuming the prima facie
case is met, the burden then shifts to the defendant to
articulate a legitimate, non-discriminatory reason for its
employment decision and to produce credible evidence to show that
the reason advanced was not pretextual.  *Id.*  Finally, if the

defendant offers such a reason, the burden shifts back to the plaintiff, and he must proffer evidence to establish that MGH's non-discriminatory justification is mere pretext, cloaking discriminatory animus. *Id.* at 804. The ultimate burden of proving unlawful discrimination rests at all times with the plaintiff. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000); *Tobin*, 433 F.3d at 105.

MGH does not dispute that Plaintiff's Asperger's Syndrome constitutes a disability under the ADA. It moves for summary judgment on the ground that Plaintiff cannot demonstrate that he was able to perform the "essential functions" of his position. In the alternative, MGH argues that even if Plaintiff were able to set forth a prima facie case of discrimination under the ADA, there is no evidence to suggest that the reasons it gave for terminating Plaintiff were pretextual. Finally, MGH argues that Plaintiff's reasonable accommodation claim fails because the undisputed evidence shows that MGH provided Plaintiff with the accommodations he requested, and that Plaintiff was still unable to perform the essential functions of his job.

1. Essential Functions

In order to satisfy the second prong of the prima facie test, Plaintiff must show that he was a "qualified individual," defined as someone "who, with or without reasonable

accommodation, can perform the essential functions of the employment position that . . . [he] holds or desires." 42 U.S.C. § 12111(8). "An 'essential function' is a fundamental job duty of the position at issue . . . [it] does not include the marginal functions of the position." *Kvorjak* v. *Maine*, 259 F.3d 48, 55 (1st Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(1)) (internal citations omitted). Whether a job function is "essential" is determined by looking at numerous factors, including: the employer's judgment as to which functions are essential; written job descriptions of the job prepared before considering applicants; the amount of time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; and the work experience of past and current incumbents of the job. 29 C.F.R. § 1630.2(n)(3); *see Mulloy* v. *Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006). In the absence of evidence of discriminatory animus, the First Circuit "generally give[s] substantial weight to the employer's view of job requirements." *Ward* v. *Mass. Health Research Inst., Inc.*, 209 F.3d 29, 34 (1st Cir. 2000). "In other words, [a court's] inquiry into essential functions 'is not intended to second guess the employer or to require the employer to lower company standards.'" *Mulloy*, 460 F.3d at 147 (quoting *Mason* v. *Avaya Communications, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004)).

MGH contends that Plaintiff is not a qualified individual, because the record demonstrates that Plaintiff was unable to perform the essential functions of his job with or without reasonable accommodations.  For evidence of the essential functions of Plaintiff's position, MGH principally relies on its official Job Description for the position of Bioinformatics Specialist.  That description indicates that in addition to the ability to perform statistical analysis using SAS, the position requires "strong communication skills," the ability to "work independently on projects with limited supervision" and the ability to "[c]ommunicate with clinical investigators" and "[w]ork collaboratively with nurses, physicians, and other ancillary staff on a daily basis."  That these are essential functions of the position of Bioinformatics Specialist is corroborated by the affidavit of Dr. Finkelstein.

MGH contends that during his time at the Biostatistics Center, Plaintiff demonstrated a clear inability to follow instructions or work either collaboratively with his colleagues or independently with limited supervision, as the job requires. MGH further contends that its implementation of various accommodations in response to Plaintiff's disclosure of his Asperger's Syndrome and request for accommodations resulted in little or no improvement.  Specifically, despite being given a

highly structured training schedule with specific tasks and
assignments scheduled throughout the day and being informed, on
multiple occasions, that he would no longer be training with Ms.
Smoot, Plaintiff continued to attempt to shadow Ms. Smoot to the
point of causing her to feel uncomfortable around him.

Plaintiff does not dispute that the ability to follow
instructions and the ability to work both collaboratively and
independently, are essential functions of the job of
Bioinformatics Specialist.  Rather, Plaintiff contends that after
his initial argument with Smoot and the implementation of the
training plan, "his entire time at the center was a collaboration
between himself and other staff."  In support of this assertion,
Plaintiff cites to a series of relatively unremarkable emails
between himself and other staff members, presumably to
demonstrate that he was able to communicate effectively.
Plaintiff similarly disputes MGH's contention that Plaintiff was
unable to work independently or without rigid structure as
unsupported by the evidence.

In order to survive summary judgment, Plaintiff must point
to some facts in the record that contradict MGH's evidence or
otherwise create a genuine dispute about the "essential
functions" of his former position and his ability to perform
them.  It bears emphasizing, however, that "conclusory

allegations, improbable inferences, and unsupported speculation"
are insufficient. *Sullivan*, 561 F.3d at 14 (quotation and
citation omitted).  Here, apart from the conclusory allegations
that Plaintiff was able to work both collaboratively and
independently, and citations to a few emails where he appeared to
be communicating effectively with his coworkers, Plaintiff has
done nothing to rebut MGH's evidence that he was unable to work
collaboratively or independently.  The record amply demonstrates
that in his short time at the Biostatistics Center, Plaintiff
created serious doubt about his ability to perform these
essential functions, even after receiving accommodations.

     With respect to Plaintiff's alleged inability to follow
directions, the record is replete with examples of Plaintiff
failing to follow directions even after a structured daily
training plan was reduced to writing and provided to him.  In
order to dispute MGH's contention that Plaintiff was unable to
follow directions, Plaintiff relies heavily on the deposition of
Dr. Finkelstein, which I permitted Plaintiff to take after MGH
had already moved for summary judgment.  However, even with the
benefit of Dr. Finkelstein's deposition, Plaintiff has failed to
create a genuine issue of material fact.

     Plaintiff contends that discrepancies between Dr.
Finkelstein's testimony and other evidence in the record belie

MGH's proffered reasons for terminating his employment, and thus create genuine issues of material fact. Specifically, Plaintiff asserts that: (i) contrary to Dr. Finkelstein's testimony, Plaintiff did submit work logs; (ii) contrary to Dr. Finkelstein's testimony that she told Plaintiff to cease contact with Smoot, the training agenda provided to Plaintiff indicated that Smoot was to train him; (iii) contrary to Dr. Finkelstein's testimony that Plaintiff was unable to follow clear instructions, an email from Ms. Ringwood indicates that he could; and (iv) contrary to Dr. Finkelstein's testimony that Plaintiff was not supposed to be in the office on the morning of August 4, 2010, an email from Ms. Hintlian says he was to work the same hours as Smoot.

MGH disputes that any of the portions of Dr. Finkelstein's testimony cited by Plaintiff create genuine issues of material fact.

First, with respect to the work logs, Dr. Finkelstein's testimony reflects her belief, based on her conversations with Ms. Ringwood and her review of email correspondences between Ringwood and Plaintiff, that Plaintiff did not follow directions with respect to completing the work logs, but instead took it upon himself to log his work by using the "track changes" feature

in Microsoft Office to edit the agendas to reflect the tasks he had completed.

Second, with respect to Dr. Finkelstein's instructions to Plaintiff to have no further contact with Smoot, those instructions came on August 4, and Plaintiff's training agenda for August 4 and 5 reflect that Plaintiff was not to train with Ms. Smoot.  Despite Dr. Finkelstein's admonition — following the August 3 incident where Smoot became so uncomfortable with Plaintiff that she moved offices — Plaintiff still went to Smoot's office and requested to work with her.  And, although Plaintiff's agenda for August 3 indicates that he was to meet with Ms. Smoot "to follow up on information reviewed during the morning [training] session if needed," Plaintiff nonetheless insisted that he shadow Smoot, and had to be reminded by Ms. Ringwood that he was not to shadow Smoot until the following week so that she had time to finish the projects she was working on before leaving the Center.

Third, MGH disputes that Dr. Finkelstein's testimony that Plaintiff could not follow directions is refuted by the August 3 email from Ms. Ringwood to which Plaintiff cites.  While expressing pleasure that Plaintiff could work with Ms. Smoot, Ringwood needed to remind him in the email that he should not be shadowing Smoot but should focus on his assigned tasks instead.

Finally, MGH contends that it is irrelevant whether Dr. Finkelstein testified that at the time Plaintiff scared Smoot he was not even supposed to be in the building, because even conceding that Plaintiff had been instructed to work the same hours as Smoot, he had similarly been instructed not to have any contact with her regarding the ARDS project.

Viewing the evidence in the light most favorable to Plaintiff, I agree that certain portions of Dr. Finkelstein's deposition testimony are not entirely consistent with other, principally documentary, evidence. However, I nevertheless conclude that Plaintiff has failed in his attempt to identify genuine issues of material fact regarding his ability to perform the "essential functions" of his position by parsing Dr. Finkelstein's deposition testimony for minor inconsistencies. At best, Plaintiff has demonstrated that, after the Center implemented a highly structured training program with close supervision, he showed marginal improvement in his ability to follow directions and work effectively. The law is clear that "even when an employer and employee have made arrangements to account for the employee's disability — a court must evaluate the essential functions of the job without considering the effect of the special arrangements." *Phelps* v. *Optima Health, Inc.*, 251 F.3d 21, 25 (1st Cir. 2001); *see, e.g., Basith* v. *Cook County,*

241 F.3d 919, 930 (7th Cir. 2001) (delivery of medicine remained essential function of job despite special assignment allowing employee not to deliver medicine for period of time); *Pickering* v. *City of Atlanta*, 75 F. Supp. 2d 1374, 1378-79 (N.D. Ga. 1999) (temporary assignment of prison guard to "light duty" because of her disability does not change essential functions of prison guard position); *Anderson* v. *Coors Brewing Co.*, 181 F.3d 1171, 1175-76 (10th Cir. 1999) (relevant functions are those of "TPO" position for which employee was hired, as opposed to can-sorter position to which she was assigned); *Miller* v. *Ill. Dep't of Corr.*, 107 F.3d 483, 485 (7th Cir. 1997) (essential functions of prison guard position included all functions required of prison guards, even when plaintiff had been allowed to rotate only between certain assignments).

Given the largely uncontroverted evidence that Plaintiff struggled to work effectively in his position even after the Center implemented a highly structured training program with close supervision, no reasonable jury could conclude that he was able to perform the essential functions of his position.

## 2. Reasonable Accommodation

Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified applicant or employee with a disability, unless the employer can demonstrate that the

accommodation would impose an undue hardship on the employer's business.  42 U.S.C. § 12112(b)(5)(A).  Although a claim for discrimination under the ADA for failure to provide reasonable accommodation is sometimes treated as a separate cause of action from an underlying discrimination claim, the two claims are to a degree inextricable because the ultimate question to be answered with respect to both is whether Plaintiff was able to perform the essential functions of his job "with or without reasonable accommodation."  *See* 42 U.S.C. § 12111(8).  To survive summary judgment on his reasonable accommodation claim, Plaintiff must produce evidence from which a reasonable jury could conclude that: (1) he is disabled within the meaning of the ADA; (2) he was able to perform the essential functions of the job with or without a reasonable accommodation; and (3) that MGH, despite knowing of his disability, did not reasonably accommodate it. *See Rocafort* v. *IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003). The analysis is therefore identical to the analysis of Plaintiff's discrimination claim, except that instead of proving that MGH took an adverse action against his employment as a result of his disability, Plaintiff need only prove that it failed reasonably to accommodate that disability.

Plaintiff does not dispute that as soon as he disclosed his diagnosis of Asperger's Syndrome, MGH took steps to accommodate

that disability. It first referred Plaintiff to Occupational
Health for an evaluation. On the advice of Occupational Health
and as requested by Plaintiff in his disclosure letter, it
developed a detailed, structured training program for him. Each
day, Plaintiff was provided with an agenda listing his specific
assignments for the day and indicating whom he would be working
with and reporting to. The creation and implementation of this
structured program required a significant time investment by
Center staff, who had to supervise Plaintiff closely to ensure
that he was staying on task. MGH contends, through Dr.
Finkelstein's affidavit, that while it was able to provide this
degree of structure and supervision on a short term basis, "it
could not sustain this for the long term and it did not appear
that [Plaintiff] would be able to work independently without
rigid structure."

While MGH has presented limited evidence regarding the
feasibility of continuing to provide Plaintiff with detailed
daily agendas and monitoring him to ensure he was staying on
task, the burden initially rests with Plaintiff to demonstrate
the feasibility of a requested accommodation. *See Reed* v. *LePage
Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (noting that
burden shifts to defendant to demonstrate undue hardship only
upon a showing of facial feasibility by plaintiff). Plaintiff

has presented virtually no evidence that the kind of structure
and close supervision he required was feasible on a long term
basis, or even that the structured program that the Center
implemented on a short term basis had enabled him to perform
successfully the essential functions of his position.  Moreover,
simply because the Center was willing to offer on a short term
basis the kind of rigid structure Plaintiff requested and
required, does not mean that the ability to work independently
without rigid structure is something other than an essential
function of the position.  *See Phelps,* 251 F.3d at 25-26.  As the
written job description for the position of Bioinformatics
Specialist states clearly, the ability to "work independently on
projects with limited supervision" is an essential function of
the job.  Plaintiff has produced no evidence to suggest
otherwise.

### IV.  MOTION TO AMEND

On June 9, 2014, over two and half years after Plaintiff
filed his complaint with this court and just weeks before a
scheduled hearing on MGH's already-filed motion for summary
judgment, Plaintiff filed a motion for leave to amend his
complaint to add a claim under Mass. Gen. Laws. ch. 151B, § 4,
the Massachusetts anti-discrimination statute.  It bears noting
that when plaintiff earlier filed a complaint with MCAD on August

17, 2010 he asserted claims under both the ADA and Ch. 151B.
However, Plaintiff's complaint in this court, filed November 23,
2011, pleads only ADA claims.  Plaintiff attributes his failure
to plead a cause of action under Chapter 151B in this case to
mere inadvertence on the part of his counsel.

The default rule directs that "[t]he court should freely
give leave [to amend] when justice so requires," Fed. R. Civ. P.
15(a)(2), unless the amendment "would be futile, or reward, *inter
alia*, undue or intended delay."  *Resolution Trust Corp.* v. *Gold*,
30 F.3d 251, 253 (1st Cir. 1994).  However, where, as here, the
motion to amend is filed after the opposing party has timely
moved for summary judgment, a plaintiff is required to show
"substantial and convincing evidence" to justify a belated
attempt to amend a complaint.  *Gold*, 30 F.3d at 253.

Here, Plaintiff's motion to amend falls short of satisfying
either standard.  First, in light of my rulings on Plaintiff's
ADA claims, even under the more liberal standard of Fed. R. Civ.
P. 15(a), Plaintiff's proposed amendment would be futile.  This
is because discrimination claims under Chapter 151B are in this
context analyzed in a virtually identical manner to claims under
the ADA.  *See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d
11, 21 n.5 (1st Cir. 2002) (stating that Chapter 151B, § 4
"tracks the ADA in virtually all respects"); *Labonte* v. *Hutchins*

*& Wheeler*, 678 N.E.2d 853, 856 n.5 (Mass. 1997) (stating that Chapter 151B "closely mirror[s] the Americans with Disabilities Act," and announcing that federal case law construing the ADA should be followed in interpreting Chapter 151B). Moreover, the "inadvertence" of Plaintiff's counsel in failing to plead a cause of action under a cognate provision of state law — the factual predicate for which is the same as the ADA claims which he did plead — which was asserted earlier before the MCAD can hardly be considered "substantial and convincing evidence" sufficient to justify amending Plaintiff's complaint after MGH has timely moved for summary judgment.

Despite the similarities between claims under the ADA and Chapter 151B, granting Plaintiff's motion would cause prejudice to MGH, which would have to expend at least some additional resources moving for summary judgment on Plaintiff's state law claims. For these reasons, Plaintiff's motion for leave to amend will be denied.

## V. CONCLUSION

For the reasons stated more fully above, MGH's motion for summary judgment is GRANTED as to both counts of Plaintiff's

complaint.  Plaintiff's motion for leave to amend his complaint

is DENIED.


                          _/s/ Douglas P. Woodlock_
                          DOUGLAS P. WOODLOCK
                          UNITED STATES DISTRICT JUDGE